Good morning, Your Honor. My name is Russell Brooks. I represent the appellants in this matter, Verl and Tootie Jones. I'd like to speak for 15 minutes and reserve 5 minutes for rebuttal. May I do so? Your Honors, this appeal concerns a water diversion required by a small family ranch and whether that diversion significantly harms bull trout within the meaning of the Endangered Species Act. This appeal is very straightforward. The appellees have presented only evidence of potential harm. That's not enough under the applicable standard. Despite no evidence that a single bull trout has ever been harmed, let alone significantly harmed, in over 40 years that the diversion has been operated. And despite evidence that bull trout are not likely to be significantly harmed in the future, the district court granted summary judgment and enjoined the Jones diversion. There's a question as to what the appropriate standard is. As I understand it, the court was relying on Section 7, likely to adversely affect. And your position is that it should have used Section 9, reasonably certain threat of imminent harm. Is that, do I have that correct? That's exactly right, Your Honor. In large part, the district court relied upon the findings in a Section 7 biological assessment. Now, the standard under Section 7 in a biological assessment is whether or not the activity or the action is likely or not likely to adversely affect the species. That is not the Section 9 standard for a take. Under Section 9, the court must determine, viewing the evidence in the light most favorable to the Joneses, whether the district court correctly applied the relevant substantive law. Now, what that means is that there must be a reasonable certainty of imminent harm resulting in actual death or injury. The Section 7 standard is a far cry from that Section 9 take standard, particularly when an injunction is involved. Did you say Section 9 take standard? Excuse me, Your Honor? Did you say take standard? Yes, Your Honor. What do you mean by that? It's a word of art. I'm not familiar with that. Take is a word of art under the ESA, and what that means in the context of this case is that bull trout have been significantly harmed, resulting in actual death or injury, or will result in actual death or injury. Now, harm has been specifically defined. In the context of this case, we're dealing with habitat degradation. Now, habitat degradation by itself does not constitute harm. In order to have harm, there has to be significant impairment of a sentence. I guess my question is that Karen Thea seems in her declaration to talk about this high likelihood of harm, although not necessarily mortality, which would seem to meet a Section 9 take standard. On the other hand, we have Mr. Jones and several other people, including conflicting evidence from the State biologist. So I guess I'm wondering in the end, at this stage, does it boil down to a he said, she said, and there's just a factual issue that needs to go to trial? That's exactly right, Your Honor. You have the appellee's expert, Ms. Thea, and then you have Mr. Larkin, the Idaho Fish and Game fish manager on the other side. You also have the testimony of the Joneses, Verl Jones, Tootie Jones, and their ranch hand. And so basically what you have here is a he said, she said kind of thing that creates a genuine issue of material fact. Let me ask you about the Joneses. I mean, it's sort of one of these kind of abstract questions, because, of course, he says, I never saw in my 40 years, and also I, the ranch hands say, you know, we kind of monitor the crick and that sort of thing. But they don't necessarily put time frames on their opinions, and we're particularly concerned about the August-September migration period. Does that go to the weight of their testimony, or should that be viewed as not having sufficient testimony as to the precise issue at hand? Are you referring to the Joneses? We have the Joneses and the related people who filed what I'll call kind of general affidavits. Your Honor, Mr. Jones states that in 40 years he has never seen a bull trout in his canal or in his diversion, let alone one that was harmed, and let alone one that was significantly harmed, dead, or injured. The underlying assumption is he would have been in a position to monitor the ditch and to regularly inspect or in some way having a duty to determine whether or not fish were coming into the ditch. Has that been made out? Well, Your Honor, that is actually the testimony. Mr. Jones testified that he monitored the ditch. Over the course of that 40 years, he constructed the ditch, he operated the ditch, and so this went on for 40 years, and at the end of the irrigation season, he would always inspect the entire length of the ditch. So in the course of doing that, over the course of 40 years, he never saw any bull trout in his ditch. Is there any law on the subject of whether his testimony is entitled to less dignity because he has no scientific or biological training as opposed to Ms. Thea? Well, Your Honor, I think the issue is whether his testimony creates a genuine issue of material fact, and he doesn't have to be an expert witness or qualified as an expert witness to create that genuine issue of material fact. Was there an objection by the government to his declaration on the ground that he had not qualified as an expert? There was no formal objection, Your Honor. No, there wasn't. Absolutely not. So if this goes back, my understanding is it's a non-jury trial. Is that correct? Yes, Your Honor. So it would go back before Judge Windmill, and it would be a non-jury trial, and then he would have to make the appropriate findings, at least on credibility. Your Honor, it would be a non-jury trial, a bench trial. Is this discovery closed? We're past the discovery deadlines, yes. Okay. So there wouldn't be any more experts or other people coming in, presumably. This would sort of be the record. It would go back to Judge Windmill, and then a decision would be ready, if there's a factual issue. I suppose discovery could be reopened, either by request of the parties or sui sponte by the judge. Did this case go to the mediation program for the Ninth Circuit? It did, Your Honor. Okay. Now, I think before we actually get to the point whether there would be a trial or a bench trial, we contend that the evidence is such that this court can simply reverse the lower court's decision and enter summary judgment in favor of the Joneses and do away with the injunction. Oh. Well, Your Honor, there's plenty of evidence here that outweighs the appellee's evidence. There's evidence that you can do that on summary judgment. Is there a cross-motion for summary judgment? Oh, go ahead. Excuse me? I think we're saying the thing. How can we do that on summary judgment? If now you're trying to weigh the value of one person's testimony versus the other's. We can't do that on summary judgment. Well, I think it's possible, without weighing the testimony, to determine that the evidence is such that summary judgment should be entered in favor of the Joneses. But the trial judge shouldn't weigh the evidence on a motion for summary judgment, and you're asking the appellate court to do so. No, Your Honor.  I don't think that's the case. But simply, the appellees have not come forward with their – with evidence to meet their burden. Did you move for cross-summary judgment? No, Your Honor. Okay. It seems to me that answers that question, because maybe you could, but since you didn't, I don't think that's properly before us to determine as a matter of law summary judgment in your favor. I don't know of any authority for that. Well, I'll move on, Your Honor. Now, the district court reached two conclusions concerning harm to the species, significant harm, and enjoined the Joneses' diversion. But even if accepted, the facts do not show a reasonable certainty of imminent harm, particularly when considered with other uncontested facts and conflicting evidence. Now, the district court inferred that without upstream migration, breeding injury is imminent. But mere impeding movement upstream beyond the diversion is not enough to prove imminent harm. Now, the record shows that all of Otter Creek is excellent habitat. It's excellent for breeding, and it's excellent for sheltering. The biological assessment, the BA, describes the excellent habitat of the creek. The appellee's own expert admits that the creek contains excellent habitat. Therefore, should the diversion actually prevent movement upstream, the rest of Otter Creek below the diversion, which is the majority of the creek, is available for breeding and sheltering. Let me ask you just a practical question, and tell me if it's not in the record, then I don't probably need to know. But at one point, Mr. Jones wrote a letter, said, we're kind of going to put this thing on hold or put a little fish screen in. I know the state biologist wanted to do a little stepping pool operation on the creek. Did that ever happen? The fish screen? No, Your Honor. The fish screen has not been put in place. How much would that cost? Is that in the record? I don't know if the specific cost is in the record, but it is in the record that it's unnecessary and that it's burdensome and that it is expensive. Incidentally, why do we not have any participation here by either the Forest Service or the Fish and Wildlife Service or the Idaho agencies? This is strictly a private suit against a private landowner. It is, Your Honor. Now, the federal government was initially a defendant in this case, but then they settled with the plaintiffs below, and so they were dismissed from the suit. And the suit at that point became the Idaho Watersheds Project versus the Joneses. Was the state of Idaho in the picture at all? They never intervened, and they were never sued, Your Honor. And the Joneses aren't under any state or federal order to do anything specific with this diversion? They are not, Your Honor. Now, the record doesn't demonstrate that the bull trout population is fragmented, and that was another reason that Judge Windmill entered this injunction and granted summary judgment. For example, the diversion is not in place during the last two months of the spawning season, so bull trout at that point can go up above the diversion into Otter Creek for whatever purpose, including spawning. Both the biological assessment and the appellee's own expert stated that bull trout have been found above the diversion and below the diversion. The evidence shows that bull trout travel up and down the stream, regardless of the diversion, above and below, and that they've been breeding in Otter Creek during the 40 years that the Joneses have operated this diversion. The appellee's expert admitted that bull trout reds or nests have been found in Otter Creek. Clearly, there is no breeding injury here, let alone significant injury that will actually cause death or harm. But I thought the target was the ditch, not the creek. There's also the ditch, Your Honor. Yes, there is. And Judge Windmill, that was his second conclusion in granting summary judgment and in joining the diversion, that the canal itself, bull trout, would be diverted in there. But again, there's just not sufficient evidence to reach that conclusion. On part of that, let's see, if the bull trout get, you know, whether this entrainment and getting them in the ditch causes harm, is there a dispute on that, or is there only a dispute on whether they actually get in there and can't get out? Your Honor, there's a dispute on both issues, whether the bull trout actually enter the ditch and we have Mr. Jones' testimony that he's never seen one in 40 years. We have Mrs. Jones' testimony that she's never seen one in the ditch. We also have Ms. Hayes, her declaration, the ranch hand, that in four years she never saw a fish in the ditch, let alone one that was significantly harmed. So that creates a genuine issue of material fact there. Now, even if they did get in the ditch, there is absolutely no evidence in this record that the bull trout would be harmed. The studies simply were not performed. Well, what about Ms. Thea's declarations? I'm sorry, Your Honor? What about Ms. Thea's declarations? Just getting to that, thank you. Ms. Thea's declaration does not establish a reasonable certainty of imminent harm. She can't even establish they'll get in the ditch. Assuming they get in the ditch. Wait a minute. Didn't Ms. Thea see some bull trout in the ditch? There's nothing in the record like that, Your Honor. Now, there is a declaration from Stu Churchwell. He says that he saw a bull trout in the ditch. That's an excellent example of why there's not enough evidence in this record of reasonable certainty of imminent harm. That's all Mr. Churchwell said. He saw a bull trout in the ditch. He didn't say what condition it was in, whether it was tired, whether it was starving, whether it was dying, dead, or injured. No evidence beyond that. And simply seeing a bull trout in the ditch does not establish a reasonable certainty of imminent harm. Where does the ditch lead to on the other end? It starts with a diversion. Does it go out a creek? It goes down a little more than a mile, and it goes to Morgan Creek. And there, Morgan Creek has excellent habitat. Now, there was some conclusory evidence or testimony provided about a steep, rocky drop-off that would injure bull trout. But that's all. Conclusory evidence. No studies. No tests. Well, what we have, though, is an expert. You can disagree with her, but she says there's this rocky drop-off and the fish can't get back to Otter Creek. And then she goes on to say, so there's a high likelihood of injury and possible mortality, which are carried via the ditch into Morgan Creek in this way. So, basically, that's her opinion, correct? That's all her opinion. And it's unsupported, it's conclusory, and it's rebutted. It's rebutted by Mr. Larkin, the Idaho Fish and Game Manager, and it's rebutted by other evidence in the record in support of the Joneses. The testimony is that bull trout, when migrating to Otter Creek, But it's not correct to say that there's no evidence, because you disagree with her evidence, is what you're saying. Well, I don't think there's any reliable evidence, Your Honor. Simply describing But that would cause us to have to weigh the evidence to determine that. Well, I think what Your Honors have to do is look at the evidence and determine whether or not they've met their burden. And you don't have to weigh it to do that. They've proffered evidence, and they have a burden to meet. Did their evidence meet that burden? So you're down to under three minutes. You indicated a wish to reserve. Yes, Your Honor, I will reserve the remainder of my time. May I do so? Mr. Lucas? Thank you, Your Honor. Laird Lucas for the plaintiff's appellees. The Court needs to understand that Mr. Brooks was not counsel in the district court. He came in after we had pursued mediation through this Court. And, frankly, he's not familiar with the record below, and he's not accurately stating it or the law. And I'd like to try to explain to the Court why I say that. First, I'd like to remind the Court that I would just say that I don't think we need to attack him. He's stated the record the best he understands it. We have the record in front of us. Thank you, Your Honor. In 1986, the U.S. Supreme Court issued its Trilogy of Summary Judgment Decisions. Summary judgment is not a disfavored remedy. If you have the burden of coming forward and you show that you're entitled to judgment as a matter of law, the burden falls to the other side to come back and rebut what you've shown. That's what we did. We filed expert declarations. Okay, to the heart of the matter, it's the question of whether there is a genuine issue of material fact. Why is there no general issue of material fact? Because we filed evidence, including expert testimony and agency records, that were unrebutted. They did not file an expert declaration. They had a two-page affidavit from a state fish and game employee that came in the middle of this litigation, didn't propose to be an expert report. In discovery, they admitted they hired no expert, be it biology. We had an expert who filed four reports during the course of the litigation. Why do you need, when some of this is based on factual information, which is a predicate to your expert's report, why do they have to have an expert report? Because we have to pull together the science. Your Honor, the Arizona Cattle Growers' Decision that you were a part of emphasized that looking at take under the Endangered Species Act, and Judge B, take is a term of art. It means kill, injure, harm or harass endangered species. And the Arizona Cattle Growers' Decision says to look at take, A, you've got to have species present there, and then because the Endangered Species Act is a forward-looking thing, a group like my clients get an injunction that's forward-looking to stop harm in the future, you've got to explain why those endangered species that are present are likely to be harmed. And the standard is a reasonably certain threat of imminent harm. We all agree on that. I think Ms. Thea's declarations meet the Section 9 standard. And I don't think the judge mixed up Section 7 and Section 9, although what often happens is you cite parts of Section 7 cases. So I think he was on target on the legal standard and that Ms. Thea's declaration does exactly what you say. But then we're faced with factual issues. Mr. Larkin, who is a wildlife biologist from the state of Idaho, says there's no harm for obstructed migration. You know, he doesn't see a harm. And then he says that if there is one, you could use a stair-step system, for example. And so if you take his and then you take the other declarations that say, but we've never even seen a fish. So the likelihood of future, I think the likelihood of future harm has to be predicated on the fact of fish getting into the ditch. If they've never seen one, why isn't that just sort of, you might win in the end, but why don't we have a factual issue right now? Your Honor, Mr. Larkin did not say there would be no harm. What he said was he didn't think fish would go in the ditch, but he admitted that fish cannot go up and down the stream when the diversion's in place. That's one aspect of our claim. And in the record, the supplemental excerpts, page 24, is a very rough diagram of this diversion. The stream comes down, and normally it would take a bend and go off, but they block it right there and it's a straight shot down. Mistia explained that given the velocity of the flow, the fish are going to go down the diversion. And there's also evidence in the record that this ditch is not the kind of ditch that perhaps you imagine. It's actually more like a road. Isn't this the typical meat of fact disputes? Your Honor, I think what Judge Windmill did was he carefully looked at what was the evidence in front of him. And what he found was we presented expert evidence, and it's not just our expert. It was the Forest Service. The Forest Service, and there was procedural questions here. Let me explain that. We sued in December 2000 because Mr. Jones had a special use permit from the Forest Service that had expired. He had no authorization to divert until he got a new one. The Forest Service needed to do Section 7 consultation under the ESA, which they had not done. So we sued the Forest Service and Mr. Jones. We went in for an injunction in March 2001 while the Forest Service was still a defendant, saying you need to do Section 7 consultation. That was our first expert declaration that looked at both Section 7 and Section 9. The Forest Service agreed with us. They said, yes, we will do ESA Section 7 consultation, and they issued the biological assessment in April of that year, 2001. So we settled with them. They've been out of the case. That biological assessment is the Forest Service's expert view, and it says this diversion needs a measuring device, a head gate, like all diversions have so that you can measure how much water is going out, and it needs a fish spring so that fish don't go down in it. This is very common in the West. All through the upper Salmon Basin, people are installing these things. They don't cost that much money. A fish spring is about $5,000. A head gate is going to be another $5,000. Mr. Jones was paid $20,000 not to divert the year after we brought our injunction. He could have installed it, but he has not to this day. They have not installed those basic protections. As soon as they put those in, they'll satisfy the Forest Service's requirements. They'll satisfy Judge Windmill's injunction, our injunction. The Forest Service are exactly the same. You can divert. But what about Mr. Larkin who has a master's in fisheries resources? He says, I do not believe bull trout, even if they get in the ditch, will be significantly harmed or injured by the fish. But the point he's making is they will not remain in the ditch long or be stranded but will pass through. Now, that may be baloney or a fish story or whatever, but he says it and he's a biologist and you have Ms. Thea. Don't you just have kind of to do with that? Your Honor, he filed that in May or June of 2001 in the middle of our injunction proceedings. But is it in the record or not? It is in the record, Your Honor, but it's contradicted. Was it objected to? Excuse me, Your Honor. Was it objected to on the grounds, on the Doebert grounds that he had insufficient expertise? Your Honor, our approach was to not object to their evidence. You didn't object. No, we did not. But, Your Honor. It might be a thin opinion. I mean, if you got right down to it and you really pushed him on it in a deposition or in trial, it might be that this opinion would kind of crumble. But I'm kind of left, as I think the panel is, with this opinion and a counter opinion. But what happened was procedurally after he filed that, Ms. Thea responded and she explained why he had not taken into account the flow that takes the fish down. Right. And they never rebutted that. But you see, that really goes to saying, look, I don't like your opinion because I don't think you actually have a sufficient foundation. But the judge never threw it out under Doebert. Right. So instead, now, then, it goes to the weight. But if you read Judge Windmill's opinion, I'm sorry to interrupt, Judge, but. Well, don't then. Let me finish. So, you know, I think Judge Windmill, who wrote a very thoughtful and long and very helpful background, but he basically was weighing Mr. Larkin and Mr. Jones against Ms. Thea in the end. Don't you think? I respectfully disagree because I think he laid it out very clearly. The facts that he said were either undisputed or unrebutted. And from those, he concluded that they had not met a burden of showing a genuine dispute of material fact. He very carefully identifies those issues that are unrebutted. And when you read his decision, he says time and time again, the Jones did not rebut this. The Jones did not rebut that. And, Your Honor, like the Palila case, Palila 2, that you decided, there I had some help. There it was a question of, and admittedly, it was after a bench trial, but your opinion says they had witness, expert testimony, and it was uncontradicted by documentary evidence. What we had here was our experts supported by all the documentary evidence, studies by Fish and Game and the Forest Service finding the bull trout in the stream, finding that the diversion was a problem, the biological assessment saying you need a head gate and a fish screen. All of those corroborated. All they had was a two-page declaration from Larkin saying, I don't think they need a fish screen, without explaining why, without going into the science. But counsel, he said something else. The material tribal issue of fact here, the ultimate issue of fact, is harm to the bull trout. Larkin said he doesn't believe there would be harm to the bull trout. Now, you may say it's only two pages. You're only a pick from Idaho. I don't think you'd say that. But why is that an issue? Because he doesn't say that. He says, he admits the diversion needs to be changed. He admits they should not keep doing this. They should do something different because this blocks migration. He says, I don't think that fish go into the dish will be a problem because they'll come back out, but he didn't respond to Ms. Thea's more elaborate scientific declaration, but he doesn't take on the problem caused by the diversion itself so that bull trout that need to go up and down the stream can't do it when that diversion's in place. And I was going to say before, we didn't try to dispute their evidence because we thought, assuming that it's true, which the judge must do and this Court must do, it doesn't rise to the level of establishing a genuine dispute of material fact. And, for instance, let me just point out that Mr. Brooks has said, gee, they take out the diversion in September and so, therefore, the bull trout can go up and down in October and November. And, indeed, that's what the judge said. But the fact is, in the record before you, Mr. Jones filed an application with the Forest Service to get a new special use permit, and he said in there that he would irrigate, he would leave it in place until November. That's in the excerpts of record, page 82. That was prior to this litigation. He's saying it remains in place until November. Then he files a declaration later saying, oh, it's only there until September. We could go back to trial and figure out whether it's there for two more months or not, but it struck me when I was looking at this that that didn't matter. He said, oh, I never saw a dead bull trout, and you all seem to be crediting that. But the fact is the record shows that the ditch is used to drive up and down. Supplemental ER, page 17, is a report from the Forest Service talking about tire tracks in the ditch. Supplemental ER, page 63, is another observation from Ms. Thea. And page 71 is a photo. What this means is Mr. Jones was getting in his truck, driving to the end of the ditch, moving it around so he can get all the water, and then driving out. He's not looking for bull trout. He's not a biologist. We could have argued all this. We could go to trial on it. But the fact is, let's assume he's right. He hasn't seen a fish. It's a forward-looking standard anyway. Past harm is not what we're talking about. This Court's decisions make very clear you don't the past harm certainly may be relevant, but in the case test, reasonable certainty of threat of imminent harm? That's right. It's got to be a reasonable certainty. And what we said was. . . Well, wouldn't you need a fish in there to have harm? And we had evidence, unrebutted, that fish had been seen in the ditch. By Mr. Churchill? By Mr. Churchwell. But it's not unrebutted because, well, he said he saw a fish, correct? That's correct. Okay. And they say they've never seen a fish. These fish are quick, they're elusive, and they're hard to see. The fact that one was seen in the ditch. . . But nobody ever did a basic fish population study to see if they were in there during a period of migration, correct? There have been surveys for fish in the creek. There's never been. . . And not in the ditch. And not in the ditch. That's right. There haven't been those surveys. But that's a hard, expensive thing to do. We're talking about the Endangered Species Act. Remember, this is an act which talks about the importance of protecting endangered species. As this Court's opinions have said, Tennessee Valley Authority v. Hill has said, the weighing of the equities sharply favors the endangered species. We're not saying you don't weigh them. But you're supposed to err on the side of the species. And it doesn't require absolute certainty. It requires a reasonable likelihood of future harm. It's not rocket science to understand that a diversion harms the fish in the different ways by blocking their obstruction and sending them down into a ditch. That's what the Bull Trout Listing Rule talks about in great length. Ms. Thea testified in her declarations that she had seen these exact same problems throughout the Upper Salmon Basin. And, in fact, we have a program in the Upper Salmon Basin to modernize diversions. That's what we're talking about is modernizing diversions, not taking away anybody's water right, spending a little money so that fish don't get sucked down the ditch and they can come up and down. That's what the Forest Service is saying they have to do in order to be authorized to use it anyway. They cannot use this diversion, even without Judge Windmill's injunction, because they don't have a Forest Service permit. They won't get it until they agree to build the head gate and the fish screen that the Forest Service has said required. Nothing else. Something I read in the record. Maybe you can help me on that. My understanding, and I don't think that it's in the record in much detail, if at all, but my understanding from working in this area is that fish screens of the simple type called for here are going to be $5,000, $8,000, something like that. You get a revolving, a paddle drives a revolving wheel, and it keeps the fish from getting impinged on it, and it shunts them off. You've got to put in a head gate, which is normally pouring concrete, with something to measure the flow. Right now, there's nothing to measure the flow. His diversion capacity, the ditch's capacity in the record, is 7 cubic feet per second. That's supplemental ER page 28. Yet his water right is for 4 CFS. So all these years, Mr. Jones has gone out and put his rocks and his tarp there, taken as much water as he can. Nobody knows whether he's taken just 4 CFS or 7, like it says, almost double. That makes a big difference for the amount of water here. So if you put in a head gate with a measuring device, you limit his water right to what he's allowed under State law, and the rest goes down the stream, then you have this fish screen. It's not in the record, Judge, but I can tell you my practical experience is this is a $10,000, $15,000 problem, something like that. Within the amount, Mr. Jones was paid in one year not to divert his water. Was that anything at all relevant to the question of whether or not there's a genuine issue, a material fact? It's relevant, Your Honor, because I think the court ought to take into consideration the fact this is a bench trial for equitable relief only. And as Mr. Brooks admitted, there's no jury trial. But there will be cross-examination if it goes to a bench trial, will there not? Oh, most certainly there will be. But I think the fact is we briefed this over several months, and counsel for the Joneses made a tactical decision. They made a tactical decision not to hire an expert, not to take the depositions of our guys. We made a tactical decision not to take their depositions, and we all went forward to summary judgment. Now, admittedly, they said we should have a bench trial, but the problem is going to be the case gets a lot more expensive if we're going to go to a bench trial. The lower court award is presumably expensive for both sides. Indeed it is. But if we are asking for the opportunity, which may very well be their right if, in fact, there are genuine issues of material fact, to have a bench trial. And the issue of what's a material fact, you have to look at the substantive law. Under summary judgment standards, they had to come forward with facts to show they would win, not simply to create a dispute within something. That's what the trilogy of summary judgment cases in this Court's decision say. At best, they said, oh, we didn't see fish in the past. And they have a two-page thing from a state biologist saying you don't need a fish screen, but you need something. That's all they came up with. They didn't – excuse me – they didn't show that they would win, that our claims would be thrown out somehow. We focused on Section 9 standards. We showed fish were present. We used science and literature to explain why these harms would happen. And Judge Windmill said they didn't rebut that showing. I mean – Well, you make a point. I mean, certainly a trial would be expensive. And I don't know how this case is going to come out. If you're – if Judge Windmill is affirmed, of course, it's over. It's over. And there wouldn't be a trial. If there were a reversal of Judge Windmill, then there would be a trial. There would be a trial. I don't know how it's going to come out, except I would just say, apropos of your comments about the trial being expensive and these fish screens, et cetera, being within some range, that if there is a reversal, it seems to me the parties would still have the option of seeking services once again of the Ninth Circuit mediator at your option. And we – I thought we had been making progress there. Obviously, I can't talk about what happened there. No, we don't want to know what happened. I'm just saying that those services are available up until, you know, final orders of this Court and even after if the parties wish them. Thank you, Your Honor. And my claims are trying to be reasonable. The point is let's modernize these archaic diversions that harm fish. That's why bull trout is listed in part is because we've got a lot of them around the Northwest and there are programs underway to do that. The BPA, Bonneville Power Administration, is sending money to Idaho to help modernize these fish screens. It's happening all over Idaho. As the Okanagan case from the Ninth Circuit in 2003 indicated, it's happening in the Meadow Valley. That was a case where the Ninth Circuit upheld Fish and Wildlife Service and National Marine Fishery Service requiring limitations on diversions to protect salmon and steelhead until they modernize them. We're looking for ways to let the streams be more reconnected so that the fish can grow and be more healthy. But you have folks who are refusing to do anything like here where the Forest Service says they need to do it for a special use permit and now the District Court has said they need to do it under the ESA. Until we filed this lawsuit, they were irrigating, taking the water out, without a special use permit. They were not following the law. The Forest Service had not stopped them. This is in December of 2000. Their permit had expired in 1998. They had continued to divert. We sent notice letters, and then when we filed the suit, the Forest Service complied with the ESA, and now we're trying to get them to do it. Thank you, counsel. Your time has expired. Mr. Brooks, I understand you have some reserve time. I'd like to seize upon something that Counsel for Appellees stated. He stated that the point of all this is to have the Joneses modernize their diversion. That's simply irrelevant. It doesn't matter if the diversion is constructed of rocks and a tarp or if they bring in something that NASA constructed. The point is, whether or not that diversion, whatever it may be, is causing a take of listed bull trout. Significantly habitat degradation that significantly impairs essential behavioral patterns, that significantly harms the species, and that will cause actual death or injury. Now, Counsel for the Appellees also said that before they brought this suit, that this was going on and that was going on. They were taking the water. They didn't have this. They didn't have that. It stands out that what he didn't say was going on was take of bull trout, and that's what this is all about. And the reason that he didn't say that is because it's simply there's not enough evidence in the record. Counselor, one thing he said that caught my attention is that he suggests that there are two categories of showings by his side and a finding by Judge Wilmill that they were either unrebutted or not responded to in some way. What's your response to that? Well, Your Honor, there's two basic conclusions the district court made based on the evidence that the appellees presented, that breeding was impaired because the bull trout could not get above the diversion. That's rebutted. It's rebutted by Mr. Larkin, by Mr. Jones, by Mrs. Jones, and by Ms. Hayes. And, frankly, even before you get to the Joneses' evidence, they didn't provide sufficient evidence to prove their case. The second conclusion is that bull trout enter into the canal. First, that's simply not enough because it's not enough that they just get into the canal, they have to be significantly impaired, resulting in significant harm that will cause actual death or injury. Just saying they get into the canal isn't enough, even if you tack on the conclusion that, well, if they get in there, they're going to be harmed. That's not enough. It's not an issue of simple harm. It's significant harm, significant degradation, significant impairment, actual death or injury. So, frankly, they haven't met their burden, but that also is rebutted. It's rebutted by Mr. Larkin. It's rebutted by Mr. Jones, Mrs. Jones, Ms. Hayes. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, McKeown, Bea